IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 08-100-GMS |
| ) | |
| LEVAN MORALES ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

**I.   INTRODUCTION**

On July 10, 2008, the Grand Jury for the District of Delaware indicted Levan Morales ("Morales") on one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Presently before the court is Morales' Motion to Suppress Physical Evidence and Statements. The court held an evidentiary hearing in connection with this motion on November 20, 2008. The court subsequently directed the parties to file proposed findings of fact and conclusions of law.

**II.   FINDINGS OF FACT**

At the evidentiary hearing, the United States called one witness: Michael Rodriguez ("Rodriguez"), a Master Sergeant in the Wilmington Police Department assigned to the Drug, Organized Crime and Vice division. Morales called two witnesses: Lionel Robinson ("Robinson"), a friend of Morales who was present during the incident, and Tomanick Williams ("Williams"), another friend, who was actually talking to Morales on the phone moments before he was tasered by Rodriguez. After listening to the testimony of the witnesses, and observing their demeanor, the court concludes that Rodriguez's, Robinson's, and Williams' accounts of the

facts are credible. The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

On June 13, 2008, at approximately 11:00 p.m., Detective Danny Silva ("Silva"), Detective Randy Pfaff ("Pfaff"), and Rodriguez were on patrol in the Riverside area of Wilmington in an unmarked police vehicle. (D.I. 23 at 14-15.) Although unmarked, the vehicle was fully equipped with internal police lights, sirens, and all of the three officers were wearing vests that said "Police" across the front. (*Id.* at 15.) The officers recognized the Riverside area of Wilmington, which includes the Riverside Housing Project, as a high-crime area.[1] (D.I. 23 at 15-16.)

As Rodriguez was headed southbound on Claymont Street, he observed a gray Chrysler Concorde driving approximately twenty feet in front of him. (D.I. 23 at 18-19.) He followed the vehicle until it stopped about forty feet from the intersection of Claymont and East 27th Street. (*Id.* at 20-21.) At that time, the officers decided to stop their vehicle approximately ten feet behind the parked Concorde, which was partly obstructing the roadway. (*Id.* at 36.) Although this occurred at night, the street was lit and there were no obstructions precluding Rodriquez from clearly observing what was happening around him. (*Id.* at 21.)

As Rodriguez began to navigate his vehicle around the Concorde, he observed an individual, later identified as Morales, exit the right rear passenger side of the Concorde. (D.I. 23 at 21-22, 37.) While exiting, Morales placed his left hand on the right side of his waist band and motioned it slightly upwards, downwards, then up again while gripping an object under his shirt.

---

[1] This recognition is based on the incidents the officers were personally involved in, as well as reviewing statistical crime analysis reports that are distributed throughout the Wilmington Police Department. (D.I. 23 at 16.)

(*Id.* at 24-25.) Rodriguez believed this motion was consistent with a "security check."[2] (*Id.* at 22.) As a result, Rodriguez became suspicious that Morales was carrying a concealed firearm. (*Id.* at 25.) Morales then shut the vehicle door, turned, and began walking around the front of the Concorde to cross the street. (D.I. 23 at 25.) Shortly after exiting the vehicle, Morales answered a call on his cellular phone from Williams. (*Id.* at 66-67.)

Without activating the police lights or siren, Rodriguez parked his vehicle in front of and slightly beside the Concorde. (D.I. 23 at 26-27.) Morales, while walking away from the vehicles, proceeded towards a courtyard on the south side of Claymont Street. (*Id.* at 27.) During this time, Rodriguez believed Morales recognized his vehicle as an unmarked police car and was acting nervous.[3] (*Id.* at 28.)

The officers exited their vehicle to investigate and Rodriguez instructed Morales to "come here." (D.I. 23 at 28.) Morales looked over his shoulder at Rodriguez, but then continued walking away increasing his pace. (*Id.*) Since Morales was walking away, Rodriguez was unable to clearly see Morales' hands. (*Id.* at 29.) As a result, Rodriguez decided to draw his taser. (*Id.*) He then, in a loud command voice, yelled, "let me see your hands" twice. (D.I. 23 at 29.) Pfaff, who was also positioned behind Morales, gave a similar command.[4] (*Id.*) Despite these orders,

---

[2] A security check occurs when a person carrying a firearm in their waistband touches the area in order to ensure that the firearm is tightly secured against his or her body. (D.I. 23 at 8.) Rodriguez received extensive training in recognizing security checks from his experience as a police officer, lead instructor for the Wilmington Police Academy's officer survival course, and as a member of the SWAT team. (*Id.* at 4-14.)

[3] Rodriguez testified that Morales originally looked like he wanted to walk towards the back of the Concorde, until he saw the police vehicle. (D.I. 23 at 27.) Then, he turned in the opposite direction and walked around the front of the Concorde, but continued to look over his shoulder at the police vehicle while walking away. (*Id.* at 26-27.)

[4] At that point, the third officer, Silva, also had his firearm drawn and ordered the other occupants in the Concorde, including Robinson, to put their hands up. (D.I. 23 at 68-69.)

Morales continued to walk away from the officers.[5] (*Id.* at 29-30.) Rodriguez, who was approximately seven feet behind Morales, then observed Morales dip his right shoulder. (*Id.* at 30.) Feeling that Morales was attempting to draw a weapon and turn towards him, Rodriguez deployed his taser striking Morales in the back. (D.I. 23 at 30.)

The entire incident, starting from the moment Rodriguez observed Morales exit the Concorde, occurred within five to ten seconds. (D.I. 23 at 40.) At the time he was struck, Morales was still walking away from the officers and refusing to obey their commands. (*Id.* at 31.)

While Morales was incapacitated, Rodriguez handcuffed him, rolled him over, and conducted a search. (D.I. 23 at 31.) A loaded nine-millimeter KelTech handgun was recovered in the right side of Morales' waistband. (*Id.*) His cellular phone was also recovered during the subsequent search.[6] (*Id.* at 80-81.)

## III. DISCUSSION

This court has previously considered and discussed at length the principles of law that apply to civilian/police encounters of the type at issue here.[7] The facts in this matter, though, are somewhat distinguishable from *Coleman*, and thus present an even closer case. The court must, nevertheless, deny Morales' motion.

---

[5] From the moment Rodriguez first told Morales to "come here," until the time he deployed his taser, Morales walked a total of three steps. (D.I. 23 at 46-47.)

[6] Although Williams was on the phone with Morales during the incident, the testimony was unclear as to when he stopped responding to her during the call. (D.I. 23 at 76.)

[7] The court will not repeat its discussion of the applicable legal precepts but instead direct the reader to its opinion in *United States v. Coleman*, No. 08-107-GMS, 2009 U.S. Dist LEXIS 11423 (D. Del. Feb. 17, 2009).

The court will first determine when Morales was seized, and then determine whether the seizure comports with the reasonable suspicion standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *See also United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009); *United States v. Coleman*, No. 08-107-GMS, 2009 U.S. Dist. LEXIS 11423, at *3 (D. Del. Feb. 17, 2009).

### A. When was Morales Seized?

In *Coleman*, the court concluded the seizure occurred when the officer forcefully and repeatedly ordered Coleman to show his hands. Similarly, in this case, Rodriguez and Pfaff both, in a loud voice, repeatedly commanded Morales to show his hands. At that point, the officers made it clear that Morales was not free to ignore their commands. In other words, a reasonable person in Morales' position would not have felt free to terminate the encounter. *See Coleman*, 2009 U.S. Dist. LEXIS 11423, at *6.

Thus, the court concludes that the officers seized Morales for purposes of the Fourth Amendment when they repeatedly ordered Morales to show his hands.

### B. Whether the Officers had Reasonable Suspicion

In determining whether reasonable suspicion exists, courts consider the "totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *see also Coleman*, 2009 U.S. Dist. LEXIS 11423, at *26 (same). Specifically, in *Coleman*, the court found that the defendant's suspicious behavior, in a high-crime area and at a late hour, corroborated an anonymous tip and provided the officers with reasonable suspicion. *Coleman*, 2009 U.S. Dist. LEXIS 11423, at *29. In this case, the factors that informed Rodriguez's decision to seize Morales were: (1) Morales' presence in a high crime area; (2) the "security check" when Morales first exited the Concorde; (3) the direction Morales was walking when he exited the vehicle; (4) Morales' behavior in continuing to look in the direction of the police vehicle as he was walking

away; (5) Morales' failure to submit to or follow Rodriguez's initial command to "come here"; (6) Morales looking over his shoulder in the direction of Rodriguez who was wearing a vest visibly marked "Police"; and (7) the increase of Morales' pace after Rodriguez's initial commands.

These observations amount to reasonable suspicion. First, as in *Coleman*, this incident occurred relatively late at night in a high-crime area. Second, Rodriguez testified that, based on his specialized knowledge and training as a police officer in the area of concealed firearms, Morales' conduct gave him reason to suspect that Morales possessed a concealed weapon.

Specifically, Rodriguez testified that he observed Morales grip an object in his waistband and reposition it. Rodriguez further testified that he then observed Morales change the direction in which he was walking, after apparently recognizing that he was near a police vehicle. Next, after Rodriguez instructed Morales to "come here," Morales ignored the command and continued walking away, despite turning around to view the officers. At that point, Morales' hands were no longer visible, and according to Rodriguez's testimony, Morales appeared "nervous."

Given the foregoing, the court concludes that Morales' conduct in these circumstances -- when viewed through the eyes of a trained police officer when considering the totality of the circumstances of the encounter -- provided Rodriguez with the reasonable suspicion to justify the seizure.[8] Accordingly, the court will deny Morales' motion to suppress.[9]

---

[8] The court notes that, as in *Coleman*, the result in this case would be the same, even if Morales were deemed to be seized later in the encounter, *i.e.*, deemed seized when he was tased. *See Coleman*, 2009 U.S. Dist LEXIS 11423, at *3. These events evolved rapidly, thus making it somewhat difficult to find a bright line between the moment that the officers issued their last commands to Morales to stop, and the time Morales dipped his shoulder and Rodriguez deployed his taser. So, regardless of the point of seizure in this matter, it is clear that the seizure comported with the dictates of the Fourth Amendment.

Dated: April 7, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE

---

[9] Whether the use of the taser was a reasonable means of detaining Morales has no bearing on the courts Fourth Amendment analysis and, therefore, will not be discussed.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 08-100-GMS |
| ) | |
| LEVAN MORALES ) | |
| ) | |
| Defendant. ) | |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Suppress Evidence and Statements (D.I. 12) is DENIED.

Dated: April 7, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE